FILED

2009 Mar-11  PM 02:25
U.S. DISTRICT COURT
N.D. OF ALABAMA

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | | |
|---|---|---|
| ROBERT MITCHELL, | } | |
| | } | |
| Plaintiff, | } | |
| | } | CIVIL ACTION NO. |
| v. | } | 07-AR-1959-S |
| | } | |
| BEVILL STATE COMMUNITY | } | |
| COLLEGE, et al., | } | |
| | } | |
| Defendants. | } | |

## MEMORANDUM OPINION

Before the court is the motion of defendants, Bevill State Community College ("Bevill State"), Pat Reeves ("Reeves"), Penne Mott ("Mott"), and Camilla J. Benton ("Benton") (collectively "defendants"), for summary judgment in the above-entitled action brought by plaintiff, Robert Mitchell ("Mitchell"), who makes several claims. Mitchell's claims[1] are: (1) discrimination "because of"[2] disability in violation of Title II of the Americans with Disabilities Act (ADA), 42 U.S.C. § 12131 *et seq.*, and the Rehabilitation Act of 1973, 20 U.S.C. § 701, *et seq.,* against Bevill State; (2) violation of 42 U.S.C. § 1983 against Mott and Benton in their official capacities for prospective relief; and (3) the Alabama tort of invasion of privacy against Reeves. Also before the court is defendants' motion to strike Mitchell's claim for

---

[1] On May 5, 2008, this court granted in part and denied in part defendants' motion to dismiss. *See* Doc. 28. This eliminated several claims. Of note, Mitchell is no longer *pro se*. *See* Doc. 31.

[2] *See* Pla.'s Compl. 9, Oct. 26, 2007.

damages. For the following reasons, defendants' motion for summary judgment will be granted and their motion to strike will become moot.

## I. Pertinent Undisputed Facts[3]

In 1992, Mitchell was injured while working at PEMCO Aeroplex, suffering an injury to a disk in his lower back. Mitchell Dep. 41:12-45:19, 48:1-4, Sep. 19, 2008. Since then, he has neither worked nor applied for any job. *Id.* at 108:9-13. He receives "total disability" Social Security disability benefits. *Id.* at 45:3-22.[4] At various times between 1992 and 2005, he was diagnosed with other ailments. *Id.* at 56:9-23; 107:9-20. These other ailments include a foot injury, hypertension, Meniere's disease, panic anxiety disorder, and Adult Attention Deficit Disorder (AADD). *Id.* at

---

[3] Summary judgment is appropriate where the moving party demonstrates that there is no genuine issue of material fact and that he is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). In assessing whether the movant has met his burden, the court must view the evidence, and all inferences drawn therefrom, in the light most favorable to the non-movant. *Hairston v. Gainesville Sun Pub. Co.*, 9 F.3d 913, 918 (11th Cir. 1993). At this juncture, the court does not "weigh the evidence and determine the truth of the matter," but solely "determine[s] whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)(citations omitted). This determination involves applying substantive law to the substantive facts that have been developed. A dispute about a material fact is genuine if a reasonable jury could return a verdict for the nonmoving party, based on the applicable law in relation to the evidence developed. *See id.* at 248; *Barfield v. Brierton*, 883 F.2d 923, 933 (11th Cir. 1989). If there is a fact that is disputed, the court will expressly note it as such.

[4] Mitchell testified, "[The Social Security Administration ("SSA")] concluded that I'm a hundred percent disabled and can't work." *Id.* at 106:14-15.

2

107:9-20; 109:6-14.[5] Each day, Mitchell takes opiates for his back injury, namely OxyContin and Percocet.[6] Mitchell also takes Alprazolam, commonly known as "Xanax," for his panic anxiety disorder. *Id.* at 141:16-18. Mitchell takes no medication for his AADD. Mitchell Dep. 57:1-58:19.

For purposes of this action, Mitchell is only claiming that he was discriminated against based on the back injury and AADD. *Id.* at 63:1-12. Mitchell has a "loss of sensation in [his] legs, pain in [his] legs, lower back, [and] stiffness." *Id.* at 48:12-14. Mitchell claims that his back injury substantially limits him in four life activities, namely, working, learning, sexual relations, and procreation. *Id.* at 64:12-22; 66:2-68:22.[7] Mitchell claims that his

---

[5] Meniere's disease is "a disorder of the membranous labyrinth of the inner ear that is marked by recurrent attacks of dizziness, tinnitus, and deafness." Webster's Medical Desk Dictionary 422 (1986). Mitchell also receives "50% benefits" from the Veteran's Administration ("VA") for his foot injury, anxiety, and hypertension. *Id.* at 107:4-13.

[6] Mitchell takes 30mg of OxyContin daily. Mitchell Decl. 50:3-7; 51:18-21. While enrolled at Bevill State, Mitchell took 7.5mg to 15mg of Percocet per day. *See id.* at 51:13-17. As of his deposition, Mitchell asked his doctor to reduce his daily amount of Percocet and the doctor complied. *Id.* 50:13-18; 51:1-6. OxyContin and Percocet are opiates. *See United States v. Merrill*, 513 F.3d 1293, 1301 n.5 (11th Cir. 2008).

[7] Mitchell testified as follows:

Q: How does your back injury limit you in working?

A: Well, the way it limits me in working is I cannot climb ladders on airplanes, I cannot climb into wings of airplanes, and I can't crawl through spaces in airplanes, so I cannot work on airplanes.

. . . .

Q: Could you do your job that you did at UAB as a nursing assistant?

A: The job that I used to do, I believe I could do that.

back injury substantially limits him in sex and procreation because it "causes pain and stiffness, and causes a loss of sensation in [his] lower extremities." *Id.* at 66:2-7. Mitchell also testified that he has "a hard time concentrating in a school type situation," can be "fidgety," and is substantially limited in the major life activity of "learning." *Id.* at 58:11-14; Pla.'s Mot. Summ. J. Resp. Br. 20.

Mitchell has several hobbies, including following politics on the internet and scuba diving, the latter of which he did as recently as 2003. Mitchell Dep. 35:12-21; 72:18-22. Mitchell is able to take care of himself*,* take a shower, brush his teeth, lift 80-100 pounds, and mow the lawn. *Id.* Mitchell says he wants to work toward a nursing degree, not only to be eligible to become a nurse, but also potentially to work "in a law firm as a medical document reviewer or medical transcriber." Pla.'s Mot. Summ. J. Resp. Br. 2.

*A. Mitchell's interaction with Bevill State prior to 2005*

In 2002, Mitchell enrolled at Bevill State in a non-nursing program.[8] Mitchell testified that he spoke separately with his advisor, Alice Roberts ("Roberts"), and the ADA coordinator, Jamie

---

*Id.* at 70:1-71:13. Prior to his back injury, Mitchell worked at the University of Alabama at Birmingham (UAB) as a psychiatric technician/nursing assistant. *Id.* at 37:20-38:9. Mitchell testified, "I helped move patients, I helped take patients to appointments, I helped take them to their procedures, I helped the nurses take intakes on the patients, I helped watch them." *Id.*

[8] The record is not clear as to what specific program Mitchell participated in, but it appears to be Bevill State's "associate degree program." *See id.* at 137:2-23; 286:4-19. The type of program is not important to the court's discussion.

Sanford ("Sanford"), about Bevill's nursing program and the admission of persons with disabilities on prescription medication. *Id.* at 131:17-132:15; 137:1-138:21; 285:1-13. Both Roberts and Sanford told Mitchell about Bevill State's drug policy. Sanford told him that if Mitchell's doctor said that Mitchell could engage in the "essential functions" of the nursing program, "she couldn't see any reason why [he] couldn't be in the nursing program." 133:10-15.[9] Mitchell did not ask Roberts or Sanford for any "accommodation" to be in the nursing program, *id.* at 135:16-19; 144:15-146:17, nor did Mitchell tell Roberts or Sanford which particular medications he was taking.

*B. Mitchell enrolls in Bevill State's Nursing Program*

Mitchell applied, was accepted, and enrolled as a student in Bevill State's Associate Degree nursing program at its Sumiton, Alabama, campus in May, 2005. This program has required classroom and clinical rotation components. Some, if not all, student clinical rotations take place at Ridgewood Health Care Center ("Ridgewood"). *Id.* at 212:14-20.

On July 14, 2005, Mitchell attended student orientation. Mitchell Dep. at 112:22-113:2. At student orientation, Mitchell received various documentation, which may or may not have included

---

[9] The court need not and does not reach the issue of whether Mitchell could or could not perform the essential functions of Bevill State's nursing program.

5

Bevill State's drug policy. *Id.* at 119:14-23.[10] After orientation, Mitchell sought out Reeves to discuss some of the forms he had just received. With two other students present, Mitchell told Reeves[11] that he was on Medicare and that he was unsure how to fill out the insurance forms. *Id.* at 120:4-121:1; 276:13-15.[12] At some point during the conversation, Mitchell disclosed to Reeves that he was taking OxyContin, Percocet, and Xanax. *Id.* at 121:17-122:16. Reeves told Mitchell that the "way she read the [drug] policy, that [Mitchell] couldn't be in the nursing program if [he] took those medications" and purportedly stated that "they didn't need a drug test because [Mitchell] admitted to taking it, so [Mitchell] was not in the program anymore." *Id.* at 123:11-14; Pla.'s Mot. Summ. J. Resp. Br. 6. Reeves also suggested that Mitchell explore other acceptable drug regimens with his physician. *Id.* at 123:15-124:14; Reeves Decl. 4:21-5:3 (same).

---

[10] Mitchell testified, "I don't remember if it was in the orientation package or not, because I do remember asking for a copy." *Id.* at 119:21-23. Eventually Mitchell received a copy of the policy.

[11] Reeves is Bevill State's Health Sciences Division Chair & Associate Degree Nursing Coordinator.

[12] The record is not clear as to whether or not Mitchell's disclosure that he was on "Medicare" prompted Reeves to move the discussion to a private room. At one point, Mitchell claimed they never switched rooms. Mitchell Dep. 121:8. He then stated, "But at one point after we started discussing the fact I had Medicare, the other two students left the room or were asked to leave the room." *Id.* at 121:13-16. Reeves claims that after Mitchell said the word "Medicare," she moved them to a private room. *Compare* Mitchell Dep. 121:6-15 *with* Reeves Decl. 4:10-13, Oct. 29, 2008. These facts are the crux of Mitchell's invasion of privacy claim. However, as discussed *infra*, the court declines to exercise its jurisdiction over this claim.

After discussing it with his doctor, Mitchell again spoke with Reeves. Mitchell Dep. 125:19-22.[13] Mitchell told Reeves that his prescriptions had not changed. *See* 125:6-126:5. Reeves "told [Mitchell] that [he] couldn't be in her nursing program." *Id.* at 129:16-20.[14]   At some point, Reeves and Mitchell discussed Mitchell's back injury. Mitchell testified, "I remember [Reeves] telling me that **you couldn't work as a nurse with a back injury**; and that since I was going to have to go to clinicals in a hospital, that I was going to be required to do the same thing that I would if I was working as a nurse; and that people with back injuries tended to hurt their back . . . ." *Id.* at 126:16-23 (emphasis added). Reeves declared, "My discussion with Mitchell regarding his back injury was limited to the essential functions of a nursing position and patient care requirements." Reeves Decl. 5:3-5.  Nonetheless, Mitchell then attempted to pay his tuition,

---

[13] The record is not clear on the timeline of Mitchell's discussion(s) with Reeves. Mitchell testified that he visited one or more of his doctors "after [he] had come back from the nurse orientation." *Id.* at 125:15-22. The court does not know what "come back from" means here. It could mean either there was only one conversation between Mitchell and Reeves on orientation day, or two conversations on orientation day, or that there were two conversations, one on July 14, 2005, and one a later day, namely, after Mitchell met with his doctors. *See id.* It seems unlikely that Mitchell spoke with his doctor(s) on orientation day. In any event, Mitchell spoke on more than one occasion with Reeves. *See id.; see also id.* at 129:4-11 ("After I left that particular day, I had several conversations with [Reeves]."), *and id.* at 170:17-23.

[14] The timing of this conversation is uncertain. *See supra* n.13. Mitchell also testified that Reeves told him that he would have to submit proof that he was no longer on OxyContin, Percocet, and Xanax. *Id.* at 125:23-126:5; *see also* Reeves Decl. 4:16-19 (same).

which the cashier's office refused. *Id.* at 129:20-130:6. Mitchell then went to the ADA office.

Mitchell spoke with a campus ADA officer, Gina Graham ("Graham"). Mitchell told Graham about what happened with Reeves. Mitchell asked about receiving an accommodation for his prescriptions. *See id.* at 136:4-9. Mitchell testified that "she said would have to contact the nursing program and ask them if they could give [him] accommodation." Mitchell Dep. 136:17-20. Mitchell testified:

> Q: So what accommodation exactly did you want, to be in the nursing program?
>
> A: I wanted to be in the nursing program.

*Id.* at 142:20-23. Graham said "she would have to look into it." *Id.* at 136:14-20. Mitchell testified Graham later told him "that [the nursing program] would not give me an accommodation [for the medication]." *Id.* at 143:18-144:4. At no time has any Bevill State staff member told Mitchell that he could have an accommodation for his prescription medication. *See id.* at 191:12-18. Mitchell likewise testified that, during a conversation with Reeves, she told him that "she was going to find some way to have me dismissed from the program." *Id.* at 239:15-19.

On July 25, 2005, Mitchell received an email response from Barbara Johns ("Johns") of the Alabama Board of Nursing in regards to his prescription drug use at Bevill State. Johns responded:

> There are no specific drugs that would bar you from being
> admitted to a nursing program. It would have to be
> **evaluated on an individual basis**, the degree of
> impairment and drug screens, etc. The collge [sic] will
> provide that information to you at orientation and we
> would evaluate you at the time you apply for licensure to
> determine eligibility.

Def.'s Evidentiary Material Ex. 14 (emphasis added).

Also on July 25, 2005, Mitchell spoke with Mott about being
allowed in the nursing program. *See* Mitchell Dep. 149:19-161:22;
Mott Decl. 4:7-5:8, Oct. 29, 2008. *Inter alia*, Mott and Mitchell
discussed the dosage and side effects of OxyContin and Percocet.
*Id.* at 155:14-22; Mott Decl. 4:7-5:8. Mott declared:

> As the Campus Associate Dean, I does [sic] not have the
> authority to reinstate students. Any reinstatement must
> be administered by the President of Bevill State. . . .
>
> . . . .
>
> I explained that I had researched these medications and
> had given careful consideration to the issue of having
> [Mitchell] enrolled in the Program while taking these
> medications which interfere with one's ability to do
> things like driving a car, operating heavy machinery or
> other activities which require one's full attention. I
> further explained to Mr. Mitchell that I believed that
> one's full attention was required to skillfully and
> accurately monitor and care for patients in critical
> situations, *i.e.* operation of medical pumps, etc. I
> emphasized that this was particularly important when
> making critical and/or life threatening decisions. . . .
> I explained that according to these resources, side
> effects of these medications included drowsiness,
> dizziness, euphoria, hallucinations, and confusion. I
> also shared with him that there were liability issues
> involved with allowing a person on opiates to provide
> patient care. I told Mr. Mitchell that I would be glad to
> review his transcripts with him and discuss other
> possible career options with him. In response to this
> offer, **Mr. Mitchell insisted that he should be given a
> chance to participate in the Nursing Program because he**

**had not yet taken the drug test**. . . . [M]y position on his participation in the Program while taking his dosages of OxyContin and Percocet had not changed.

Mott Decl. 2:7-9; 4:12-5:8 (emphasis added).[15] Mitchell agreed with the substance of his conversation with Mott but he does not recall the emphasized statement. Mitchell Dep. 150:3-13 ("I don't recall telling [Mott] that since I had not been drug tested, I should be allowed in the program.").

On August 2, 2005, Mitchell took Johns's email response to Graham. Pla.'s Mot. Summ. J. Resp. Br. 7. On August 3, 2005, Reeves and Mitchell spoke. Reeves testified:

> I explained that he was ineligible for admission due to his disclosure that he was taking Oxycontin and Percocet. After a review with college officials of Plaintiff's request to enroll in the program, however, Bevill State decided to allow Plaintiff to enroll, subject to the same drug testing requirements as other students.

Reeves Decl. 5:6-10. On August 5, 2005, Graham told Mitchell he could begin taking classes at Bevill State. Mitchell Dep. 169:15-18.[16]

*C. The Forms and the Drug Tests*

---

[15] Mott also declared, "In support of my position, I cited to the Physicians Desk Reference [("PDR")] and the U.S. Food and Drug Administration Center for Drug Evaluation and Research information." Mott Decl. 4:19-21.

[16] Mitchell's testimony is not entirely clear about what Graham said. Later in his deposition, Mitchell testified, "She also told me that she couldn't make the nursing program let me in . . . . She told me, 'You never was [sic] out. There was just a piece of paper you didn't sign, and I'll go get it for you to sign.'" Mitchell Dep. 192:3-10. Whether or not Mitchell was "officially" out of the nursing program from either July 14, 2005 until August 3, 2005, or alternatively out of the program from August 3, 2005, until August 5, 2005, is of no consequence to the court's decision. *See supra* notes 8-10 and accompanying text.

Bevill State has a required "Student Drug and Alcohol Screen Policy" which Mitchell does not deny receiving at orientation.[17] *Id.* at Ex. 19. *Inter alia*, the policy states:

> Positive drug confirmation will result in the student being immediately withdrawn from the Health Science course in which they are enrolled . . . .
>
> . . . .
>
> Some of the classes of drugs for which screening will be conducted are available by prescription from health care practitioners. . . . **The fact that a student has a prescription for one or more of the classes of drugs which are legally prescribed by a health care practitioner does not necessarily, in and of itself, excuse the student from the effect of this policy.**

Def.'s Evidentiary Material Ex. 19, ¶ I(8), ¶ V (emphasis added). Importantly, this policy lists "opiates" as drugs that Bevill State can "screen for." *Id.* at Ex. 19, ¶ III(7)(7).

On August 22, 2005, Bevill State administered a drug test to Mitchell and other nursing students. Mitchell signed the mandatory "Student Drug and Alcohol Screen Policy Participation Form," which includes the student's acknowledgment that: (1) Bevill State has a "required component of clinical rotations"; (2) that "prior to or during participation in the clinical rotations, I must submit to a drug screen and provide a certified negative result from that screen"; and (3) that "I further understand that if I fail to provide an Adulterant Free certified negative drug result, either

---

[17] Mitchell testified, "Yes, I think it was the day of orientation that I received this." *Id.* at 193:1-3.

on initial pre-clinical screening or on random or incident related screening, I will be unable to continue in the Health Science Program." Def.'s Evidentiary Material Ex. 21. Contemporaneously with this form, Mitchell signed the "Acknowledgment of Student Drug and Alcohol Screen Policy," on which he handwrote the following, "Medications Prescribed by Doctor. Alprazolam, Oxycontin, Percocet." *Id.* at Ex. 22. Mitchell's August 22, 2005, drug test revealed no opiates (or other controlled substances) in his system. *Id.* at 197:6-14. Mitchell testified he was still taking his medications when the drug test was given. *Id.* Childers testified, "If Mr. Mitchell had taken his prescription medications in the previous seventy-two hours, I would have expected Mr. Mitchell's test results to have been positive." Childers Decl. 2:21-23, Oct. 29, 2008; Reeves Decl. 5:15-17 (same).

On August 25, 2005, Graham signed a "Confidential Instructor Notice of Disability Documentation," which states that Mitchell is to receive the following accommodations, (1) "Tape record lecture"; (2) "Extended time (1 ½) on tests and in-class assignments"; and (3) "Assistance with note-taking/duplication of lecture notes." It likewise states, "Other specific requests. **Due to his back injury, [Mitchell] may get up periodically**." Def.'s Evidentiary Material Ex. 6 (emphasis added). The form makes no mention of AADD.

On November 7, 2005, shortly before Mitchell was to begin his clinical rotations at Ridgewood, Bevill State administered another

drug test. *See id.* at 206:17-213:2 (Mitchell signed the same forms as above). On or about November 14, 2005, Mitchell's test came back positive for opiates. It was retested, with the same result. *Id.* at 208:17-20; Childers Decl. 3:8-10. On November 16, 2005, Mitchell was dismissed from the nursing program. Mitchell Dep. 227:7-236:21 (discussing the details of the dismissal).

*D. Mitchell appeals*

Mitchell appealed the decision to Mott, Benton, and the president of Bevill State, President Harold Wade. Mott agreed with the dismissal, citing the "Student Drug and Alcohol Screen Policy." Def.'s Evidentiary Material Ex. 27, 28. Benton responded, *inter alia*, that the due process policy had been followed by Bevill State officials. *Id.* at Ex. 28-29. The record does not reflect whether or not Wade responded. Mitchell further testified he was dissatisfied that no Bevill State official discussed Mitchell's prescriptions with his doctors. Mitchell Dep. 240:4-241:2. However, he never requested that they do so. *Id.*

*E. Other evidence*

Defendants filed several declarations with the court. Benton declared:

> Waiving the clinical rotation requirement and/or allowing Plaintiff to participate in the clinical rotation while taking daily dosages of 30 mg. of OxyContin, 15 mg. of Percocet a day, and Xanax (*i.e.* waiving the requirement that he be drug-free to participate in clinical rotations) would **fundamentally alter and substantially lower** the requirements of Bevill State's nursing program.

> I am not aware of any other student that Bevill State has
> allowed to participate in clinical rotations while taking
> OxyContin, Percocet, and nerve medication.

Benton Decl. 4:8-14. Declarations by Mott, Childers, Reeves contain
almost this exact language, and all declarations contain the same
emphasized language. Mott Decl. 6:16-7:2; Childers Decl. 3:23-4:6;
Reeves Decl. 7:7-15. Childers added, "Since patient care and **safety**
is a predominant concern in clinical settings, nurses, including
nursing students, are required to be drug free." *Id.* at 4:2-3
(emphasis added). Reeves added, "In my professional opinion,
providing patient care while taking 30 mg of Oxycontin and 15 mg
Percocet poses a **significant risk to patients**." *Id.* at 7:15-17
(emphasis added).

Mitchell also testified that he was "singled out" on at least
three occasions when an instructor came into the lab and told the
class that the students needed to remain standing during the lab.
*Id.* at 244:23-246:10. On one occasion, when Mitchell was limping,
a lab instructor purportedly said, "[D]on't you know that you've
got to be able to do the essential functions?" *Id.* at 255:18-256:6.

As of September 19, 2005, Mitchell was newly enrolled in
Jefferson State Community College's nursing program. *Id.* at 29:15-
17.

## II. Analysis

As a threshold matter, defendants argue that due to his 100%

SSA total disability,[18] plaintiff should be judicially estopped from claiming he is "qualified individual" under the ADA. Defs.' Mot. Summ. J. Br. 22 (citing *Stedman v. Bizmart, Inc.*, 219 F. Supp. 2d 1212, 1224 (N.D. Ala. 2002)). However, this argument is inapplicable on the evidence presented. *See Taylor v. Food World, Inc.*, 133 F.3d 1419, 1423 (11th Cir. 1998). Both *Stedman* and *Food World* stand for the proposition that "whether an individual who has certified total disability to the SSA is judicially estopped from later bringing a claim under the ADA will depend upon the specific statements made **in the application and other relevant evidence** in the record." *Food World*, 133 F.3d at 1423 (emphasis added). Mitchell's SSA application is not in the record, nor do the defendants direct the court to other relevant evidence, except to point out the mere fact that Mitchell receives SSA total disability benefits and VA partial disability benefits. This does not pass muster under *Food World.* Of note, neither party cites a case where a plaintiff is drawing disability benefits from two different federal agencies possibly based on the same injuries.

---

[18] *See* note 6. "Disability" under the Social Security Act means the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment." 42 U.S.C. § 423(d)(1). "An individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he not only is unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 423(d)(2)(A).

A. *Claims against Bevill State under the ADA/Rehabilitation Act*[19]

Generally, "[d]iscrimination claims under the Rehabilitation Act are governed by the same standards used in ADA cases," and, therefore, courts typically discuss them together, as will this court. *Cash v. Smith*, 231 F.3d 1301, 1305 (11th Cir. 2000); *see also Mo. Prot. and Advocacy Serv.s, Inc. v. Carnahan*, 499 F.3d 803, 812 (8th Cir. 2007).[20] As the Eleventh Circuit instructs:

> To state a Title II claim,[21] a plaintiff generally must prove (1) that he is a qualified individual with a disability; (2) that he was either excluded from participation in or denied the benefits of a public entity's services, programs, or activities, or was otherwise discriminated against by the public entity; and (3) that the exclusion, denial of benefit, or discrimination was by reason of the plaintiff's disability.

*Bircoll v. Miami-Dade County*, 480 F.3d 1072, 1083 (11th Cir. 2007). The elements of the *prima facie* case under the Rehabilitation Act are the same, except that the defendant must also (4) be a

---

[19] Congress recently amended the ADA via the "ADA Amendments Act of 2008." Pub. L. No. 110-325, 122 Stat. 3553 (2008). However, these changes do not apply retroactively. *E.E.O.C. v. Agro Distribution, LLC*, __ F.3d __, 2009 WL 95259, at *8 n.8 (5th Cir. 2009)(quoting *Rivers v. Roadway Express, Inc.*, 511 U.S. 298, 313 (1994)(discussing generally the retroactive application of statutes)).

[20] Section 504 provides, "No otherwise qualified individual with a disability shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance . . . ." 29 U.S.C. 794(a). Bevill State does not dispute that it receives federal funds.

[21] Title II provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132.

recipient of federal funds. *See Badgett v. Ala. High Sch. Athletic Ass'n.*, No. 07-00572, 2007 WL 2461928 (N.D. Ala. 2007).[22]

*1. Is Mitchell a "Qualified Individual With a Disability?"*

A "qualified individual with a disability" is defined as "an individual with a disability who, with or without reasonable modifications to rules, policies, or practices, . . . or the provision of auxiliary aids and services, meets the essential eligibility requirements for the receipt of services or the participation in programs or activities provided by a public entity." 42 U.S.C. § 12131(2)(emphasis added); *see also Badgett*, 2007 WL at *3 ("While the Rehabilitation Act contains no statutory definition of the term 'qualified,' the case law decided under the Act is to similar effect.")(citation omitted). Defendants deny that Mitchell has a "disability" within the meaning of the ADA.[23]

"Disability" in the ADA is defined as:

(A) a physical or mental impairment that substantially

---

[22] The defendants urge the court to apply the familiar burden shifting framework established by the Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), even though admittedly the Eleventh Circuit has not expressly utilized it in Title II ADA cases. Defs.' Mot. Summ. J. Br. 14 (citing *Turner v. City of Englewood*, 195 Fed. Appx. 346, 353-54 (6th Cir. 2008))(utilizing *McDonnell Douglas* under Title II). Mitchell does not dispute the use of the *McDonnell Douglas* framework. *See* Pla.'s Mot. Summ. J. Resp. Br. 14-15. Recently, the Eleventh Circuit tacitly affirmed its use in a Title II employment discrimination context. *See Simpson v. Ala. Dep't of Human Res.*, No. 06-04740 (N.D. Ala. 2008), *aff'd* No. 08-12330, 2009 WL 325632 (11th Cir. Feb. 11, 2009). However, this court need not and will not apply *McDonnell Douglas* to this case, particularly when this case is not about "employment" discrimination.

[23] The meaning of "disability" is the same under both Title I and Title II. *See, e.g., Albra v. City of Fort Lauderdale*, 232 Fed. Appx. 885 (11th Cir. 2007)(quoting 42 U.S.C. § 12102(2)(2006)).

> limits one or more of the major life activities of such
> individual;
> (B) a record of such an impairment; or
> (C) being regarded as having such an impairment.

42 U.S.C. § 12102(2)(2006); *see also* 29 U.S.C. § 705(20)(B)(2006).[24]
Because Mitchell ambiguously states that he was discriminated
against "because of" his disability, this court generously assumes
that he was attempting to allege all three statutory bases of
"disability." In determining whether a plaintiff has a
"disability," the court makes an "individualized inquiry." *Sutton
v. United Air Lines, Inc.*, 527 U.S. 471, 483 (1999).

*a. Impairment which substantially limits major life activities.*

This definition of "disability" involves a three-step
analysis. *Rossbach v. City of Miami*, 371 F.3d 1354, 1357 (11th Cir.
2004)(citation omitted). First, the court considers whether the
plaintiff's condition constitutes a physical or mental impairment.
*See id.* Second, the life activity that a plaintiff claims to be
limited must be a "**major** life activity." *See id.* (emphasis added).
Finally, the plaintiff must establish that the impairment
"substantially limits" that activity. *Id.* at 1357.

*i. Impairments?*

AADD constitutes a "mental impairment" within the meaning of
the ADA. *See, e.g., McCrary v. Aurora Pub. Sch.*, 57 Fed. Appx. 362,
371 (10th Cir. 2003). Likewise, a "back injury" can constitute a

---

[24] 29 U.S.C. § 705 provides the definition of "disability" under the
Rehabilitation Act, which parallels the ADA's definition.

"physical impairment" within the meaning of the ADA. *See Colwell v. Suffolk County Police Dep't*, 158 F.3d 635, 642 (2d Cir. 1998). Given the procedural posture, the court will assume that Mitchell actually suffers from AADD and that his back injury constitutes a "physiological disorder" that affects his "neurological" and/or "musculoskeletal" systems. *See id.* (citation omitted).

*ii. Major Life Activities?*

The court looks only to the "major life activit[ies] asserted by the plaintiff." *Poindexter v. Atchinson, Topeka & Santa Fe Ry. Co.*, 168 F.3d 1228, 1231-32 (10th Cir. 1999)(citing *Bragdon v. Abbott*, 524 U.S. 624, 637-39 (1999)). According to the regulations, "[m]ajor life activities means functions such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, **learning**, and **working**." 29 C.F.R. 1630.2(i)(emphasis added); *see also Rossbach*, 371 F.3d at 1357 n.3. While this list is not exhaustive, it is deemed to apply "to those basic activities that the average person in the general population can perform with little or no difficulty." 29 C.F.R. app. pt. 1630. The Eleventh Circuit has not as yet determined whether or not "sexual relations" constitute a major life activity. *Waddell v. Valley Forge Dental Assocs., Inc.*, 276 F.3d 1275, 1279 n.4 (11th Cir. 2001)(finding the determination unnecessary to the analysis). Neither will this court for reasons discussed *infra.* Under certain circumstances, depending upon the effect upon reproduction,

procreation can be a major life activity. *See Bragdon v. Abbott*, 524 U.S. 624, 643 (1999). Mitchell asserts that his mental condition substantially limits his ability to learn. He also avers that his physical condition  substantially limits his ability to work, to engage in sexual relations, and to procreate.

*iii. Do Mitchell's conditions substantially limit him?*

As defined by the EEOC, "substantially limits" means "[s]ignificantly restricted as to the condition, manner or duration under which an individual can perform a particular major life activity as compared to the condition, manner, or duration under which the average person in the general population can perform the same life activity." 29 C.F.R. § 1630.2(j)(1)(ii). To determine whether an individual is "substantially limited," the court considers: "(1) the nature and severity of the impairment; (2) the duration or expected duration of the impairment; and (3) the permanent or long term impact, or the expected permanent or long term impact of or resulting from the impairment." *Simpson*, 2009 WL 325632, at *3 (1999)(quoting 20 C.F.R. § 1630.2(j)(2)). The court considers any alleged disability "with reference to corrective [or mitigating] measures." *Id.* (quoting *Sutton v. United Air Lines, Inc.*, 527 U.S. 471, 488 (1999)). In other words, the court determines whether the plaintiff is "disabled" with appropriate corrective measures in place, *i.e.* "on" his medication. *See Sutton*, 527 U.S. at 488; *Gordon v. E.L. Hamm & Assoc.*, 100 F.3d 907, 912

20

(11th Cir. 1996)(reasoning medical conditions that necessitate **disabling treatments and the side effects** thereof may be "substantially limiting" within the meaning of the ADA)(emphasis added). The terms "major life activities" and "substantially limits" are to be interpreted strictly to create a demanding standard for qualifying as disabled . . . ." *Toyota Motor Mfg., Ky., Inc. v. Williams*, 534 U.S. 184, 197 (2002). It is incumbent upon a plaintiff to produce evidence "that the extent of the limitation . . . in terms of his own experience . . . is substantial." *Id.* at 198-99 (citation omitted). Also, mere submission of evidence of medical diagnosis is insufficient. *Id.* at 199.

Here, in regards to learning, Mitchell claims that he has been diagnosed with AADD, has a hard time concentrating in a school type situation, and is "fidgety." He has not submitted evidence that his medications, or their side effects, have limited his ability to learn. While there might be, and likely is, some connection between the side effects of the opiates themselves and his learning difficulties, the record reflects little to no evidence of any connection. Any attempt to draw an inference of a connection on the evidence presented would abandon the required individualized inquiry and would require the court to engage in guesswork. Also, merely because Bevill State provided learning oriented accommodations, *e.g.* tape recorded lectures and extra time on tests

and in-class assignments, does not establish that Mitchell's mental condition substantially limits his capacity to learn. *See Davidson v. Midelfort Clinic, Ltd.*, 133 F.3d 499, 508 (7th Cir. 1998)(plaintiff claimed to suffer Adult Residual Attention Deficit Hyperactivity Disorder ("ADHD") had limited her ability to learn in high school, college and graduate school, but that there was "little or no evidence in the record establishing that ADHD presently inhibits her capacity to learn."). Likewise, Mitchell has not presented evidence that his AADD now substantially limits his ability to learn as compared to the average person in the general population. *See Bowen v. Income Producing Mgmt., Inc.*, 202 F.3d 1282, 1287-88 (10th Cir. 2000)(recognizing that to be significantly restricted in learning, one's skills and abilities must be inferior to those of the average person). Other than Mitchell's "hard time concentrating and fidgety behavior," there is no evidence, and thus, no genuine issue of material fact, concerning whether Mitchell is substantially limited in learning.

Mitchell's claims that he is substantially limited in "working" are similarly defective. For an impairment to "substantially limit" the major life activity of "working" an individual must show "significant restrictions in the ability to perform either **a class of jobs or a broad range of jobs** in various classes as compared to the average person having comparable, training, skills, and abilities." *Gordon*, 100 F.3d at 912 (quoting

22

29 C.F.R. § 1630.2(j)(3)(I))(internal punctuation and citation omitted; emphasis added). The only class of job the court knows with any certainty that Mitchell cannot perform is his former job at Pemco. *See supra* note 7. The record is likewise lacking as to what Mitchell's job title/duties at Pemco actually were, making it nearly impossible to determine what "other classes of jobs" Mitchell could or could not perform. Indeed, even though Mitchell suffers from some degree of pain even while on his medication, he admits he can do his old job of "nursing assistant," wants to be a nurse, medical transcriber, or medical document reviewer. Mitchell can also take care of himself, take a shower, brush his teeth, lift 80-100 pounds., mow the lawn, and scuba dive. Again, taking opiates for pain may indicate that an injury is "substantial" and/or, particularly in light of *Gordon*, there might be a connection between OxyContin/Percocet/Xanax's collective side effects and Mitchell's ability to work. However other than Mitchell's conclusory testimony, there is no evidence, *i.e.* physician's affidavits, to indicate the debilitating degree, if any, of Mitchell's ability while on OxyContin/Percocet/Xanax.

Even assuming "sexual relations" to be a major life activity, the claim that he is substantially limited also fails for lack of evidence in the record. *See Smith v. Bruno's Supermarkets*, No. 04-0730, 2006 WL 2456084 at *3 (S.D. Ala. 2006)("[P]laintiff's own affidavit is the sole evidence cited as proof of the effects of her

injury has on her life activities. In her affidavit testimony, plaintiff claims her back injury 'substantially affects' her ability to . . . engage in sexual activity . . . . These merely conclusory allegations that without specific supporting facts have no probative value.")(internal quotation marks and citations omitted). The same flaw precludes any argument that Mitchell is substantially limited in "procreation," in that there is no evidence that he cannot reproduce, or how he is limited in reproduction, if at all. *See Bragdon*, 524 U.S. at 2205.

*2. Record of?*

Mitchell makes no argument in his response to Bevill State's brief on the lack of any "record of" disability other than to say that he receives disability benefits. However, his claims fail because "[t]he record-of-impairment standard is satisfied only if [the plaintiff] actually suffered a physical impairment that substantially limited one or more of her major life activities." *Hilburn v. Murata Elec. N. Am., Inc.*, 181 F.3d 1220, 1229 (11th Cir. 1999); *see also* 29 C.F.R. § 1630.2(k). As discussed *supra*, on the evidence presented, Mitchell is not limited in any major life activities, and thus does not have a "record of" disability.

*3. Regarded as?*

Mitchell alleges that defendants "regarded" him as being disabled. Such a person is defined as one who "(1) has an impairment that does not substantially limit a major life activity,

24

but is treated by an employer as though it does; (2) has an impairment that limits a major life activity only because of other's attitudes towards the impairment; or (3) has no impairment whatsoever, but is treated by an employer as having a disability as recognized by the ADA." *Hilburn*, 181 F.3d at 1230 (citations omitted). The Eleventh Circuit has held that "for a plaintiff to prevail under this theory, he must show two things: (1) that the perceived disability involves a major life activity; and (2) that the perceived disability is 'substantially limiting' and significant." *Rossbach*, 371 F.3d at 1360 (internal quotation marks in original; citation omitted). "As with actual disabilities, a perceived impairment must be believed to substantially limit a major life activity of the individual." *Hilburn*, 181 F.3d at 1230. "To show that he was **regarded as** substantially limited in his ability to work, plaintiff must prove that [defendant] considered [him] as significantly restricted in the ability to perform either **a class of jobs or a broad range of jobs** in various classes compared to the average person having comparable training, skills and abilities." *Bonner v. Home Depot*, 323 F. Supp. 2d 1250, 1262 (S.D. Ala. 2004)(quoting *Bizmart*, 219 F. Supp. 2d at 1222; *Cash*, 231 F.3d at 1306)(emphasis added). Where a plaintiff's only evidence is that she was "perceived as unable to perform a single job . . . or perhaps a very narrow range of jobs," summary judgment is due to be granted on that claim. *See Davis v. Univ. of N.C.*, 263

F.3d 95, 100 (4th Cir. 2001); *see also Rossbach*, 371 F.3d at 1359.
Mere knowledge by a defendant of a plaintiff's injury or SSI
benefits does not establish that it perceived him as substantially
limited. *See Blackston v. Warner-Lambert Co.*, 2000 WL 122109, at
*4-5 (N.D. Ala. 2000). "Additionally, we have noted that courts
consistently have held that "someone who walks [and] . . . stands
. . . moderately below average is not disabled under the Act."
*Blundell v. Health Care Auth. of City of Huntsville*, 140 Fed. Appx.
154, 155 (11th Cir. 2005)(citation omitted).

Mitchell argues that Bevill State regarded him as disabled in
the major life activity of working. He says, "Rather than question
whether he was disabled, [defendants] actions show that they
perceived him too disabled to be a nurse." Pla.'s Resp. Br. at 17.
Mitchell testified that Reeves said, "you couldn't work as a nurse
with a back injury." Viewing this evidence in the light most
favorable to Mitchell, it suggests that Reeves perceived Mitchell
as limited in his ability to work as a nurse, or at least unable to
train as a nursing student at Bevill State. However, it does not
demonstrate that Reeves perceived Mitchell to be substantially
limited in a broad class of jobs, or as here, a broad class of
potential jobs. *See Sutton*, 527 U.S. at 491. Mott even offered to
help Mitchell find "other possible career options."  Even if, as
Mitchell claims, Bevill State perceived Mitchell as a "threat" to
the safety of patients, based on Reeves's statement, "she was going

26

to find some way to have me dismissed from the program," Mott's discussion of the collective side effects of OxyContin, Percocet, and Xanax, and Reeves's declaration that Mitchell was a "significant risk to patients," there is still no proof that defendants perceived him as substantially limited in a major life activity of working in a class of jobs. *See Brunko v. Mercy Hosp.*, 260 F.3d 939 (8th Cir. 2001)(affirming district court's summary judgment in favor of hospital; holding that plaintiff-nurse with lifting restriction of 40lbs was not "regarded as" substantially limited in a major life activity by hospital). Other evidence might call for higher scrutiny in reviewing an institution's practices with regards to a plaintiff on prescription medications.

Similarly, Mitchell has provided little to no evidence that defendants had any knowledge of his AADD, nor that they considered him limited him in his ability to learn, engage in sexual relations, or procreate. Merely because Bevill State provided learning oriented accommodations, *e.g.* tape recorded lectures and extra time on tests and in-class assignments, does not establish that it regarded Mitchell's mental condition as substantially limiting his ability to learn.

Because Mitchell has failed to adduce evidence from which a reasonable factfinder could conclude that he is disabled within the meaning of the ADA and Rehabilitation Act, he is not entitled to the protection of these statutes. The court need not, therefore,

analyze whether Mitchell can establish any other element of his *prima facie* case. Summary judgment is due to be granted as to all of Mitchell's ADA and Rehabilitation Act claims.

*C. 42 U.S.C. § 1983 claim against Mott and Benton*

Mitchell's § 1983 claims are against Mott and Benton in their official capacities for prospective relief. Benton is no longer employed at Bevill State, and as such, Mitchell's claim against her will be dismissed as moot. Benton Decl. 1-2, October 29, 2008; *See Taylor v. Alabama*, 95 F. Supp. 2d 1297 (M.D. Ala. 2000). Mitchell's claim against Mott is flawed for a different reason. This court's May 5, 2008, order stated, "Whether either official has the authority to reinstate Mitchell is another question. The authority, and thus the proper entity to be joined, seems to be Bevill State, but it is not named in count II." The court made its concerns in this regard crystal clear. Mott declared, "As the Campus Associate Dean, I does [sic] not have the authority to reinstate students. Any reinstatement must be administered by the President of Bevill State." *See* Mott Decl. 2:7-9. The court was arguably incorrect by half. The proper defendant, if there was one, is the president of Bevill State, Harold Wade. Either way, Mitchell does not dispute Mott's declaration. Mitchell did not attempt to take the court up on its suggestion. His § 1983 claims will be dismissed.

*D. Invasion of Privacy claim*

The court can only assume jurisdiction over Mitchell's state

28

law claim by an exercise of its supplemental jurisdiction under 28 U.S.C. § 1367(a). Because Mitchell's federal question claims are being dismissed, the court's jurisdiction over Mitchell's state law claim is purely discretionary. 28 U.S.C. § 1367(c)(3)("The district courts may decline to exercise supplemental jurisdiction over a claim under [§ 1367(a)] if . . . the district court has dismissed all claims over which it has original jurisdiction."); *see also Busse v. Lee County, Fla.*, No. 08-13170, 2009 WL 549782, at *4 (11th Cir. Mar. 5, 2009)("[W]e expressly encourage district courts to take such action when all federal claims have been dismissed pretrial.")(citation omitted). The court declines jurisdiction over the state claim and will dismiss it without prejudice.

*V. Conclusion*

Defendants' motion for summary judgment will be granted by separate order.

DONE this 11th of March, 2009.

WILLIAM M. ACKER, JR.
UNITED STATES DISTRICT JUDGE